UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

COLLEEN GIBLIN,

                    Plaintiff,

        -against-                                    5:20-CV-00477 (LEK/ATB)

LE MOYNE COLLEGE,

                    Defendant.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.        INTRODUCTION

Plaintiff Colleen Giblin brings this action against Defendant Le Moyne College (the

"College"), asserting claims under Title I of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 et seq., § 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C.

§ 794, and the New York Human Rights Law ("NYHRL"), New York Executive Law § 296,

arising from her employment as an assistant professor at the College. Dkt. No. 1 ("Complaint").

Presently before the Court is Defendant's motion to dismiss Plaintiff's Complaint for failure to

state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. Nos. 8 ("Motion"); 8-1

at 1–2 ("Joseph Declaration"); 8-1 at 3–21 ("Exhibits"); 8-3 ("Defendant's Memorandum of

Law"). Plaintiff filed a response, Dkt. No. 13 ("Plaintiff's Memorandum of Law"), and

Defendant filed a reply, Dkt. No. 14 ("Reply"). For the reasons that follow, Defendant's Motion

is granted in part and denied in part.

## II.       BACKGROUND

### A. Complaint

The following factual allegations are assumed to be true. See Vega v. Hempstead Union

Free Sch. Dist., 801 F.3d 72, 76 (2d Cir. 2015).

Plaintiff has attention deficit hyperactivity disorder ("ADHD"), "which limits her in several major life activities, including concentrating and thinking." Compl. ¶ 47. She experiences a "variability in attention and focus" and consequently sometimes requires an accommodation in the form of extended time to complete particular tasks. See id. ¶ 19.

In or around July 2016, Plaintiff saw a job posting for the position of "Assistant Professor of Marketing" at the College and submitted an application. Id. ¶ 13. The posting stated that the College would consider "candidates who are ABD ['All But Dissertation'] and reasonably expected to complete their doctoral degree within 12 months of appointment." Id. ¶ 20. At that time, Plaintiff "expected to complete her doctoral degree" at Carnegie Mellon University ("Carnegie Mellon") by August 2018. Id. ¶ 21. The College offered her the position on December 2, 2016, and her academic year appointment began in August 2017. Id. ¶ 14. Plaintiff signed an employment contract on December 6, 2016 that "made no mention of any deadline to obtain her doctoral degree." Id. ¶ 41.

Due to events she did not anticipate at the time of her application, Plaintiff was not ultimately able to complete her doctoral degree by August 2018. See id. ¶¶ 22–29. In March 2018, Plaintiff requested an extension of time from Carnegie Mellon to complete her PhD requirements, "due to limitations imposed by her disability." Id. ¶ 22. On March 20, 2018, Carnegie Mellon "granted this request as a reasonable accommodation for her ADHD," extending the deadline for Plaintiff to defend her dissertation from May 2018 to December 2018. Id. ¶ 23.

Plaintiff "timely notified" the College of Carnegie Mellon's decision to grant her this extension. Id. ¶ 24. In response, on March 28, 2018, the College issued Plaintiff a "contract

renewal appointment letter" for the 2018-2019 academic year, allowing Plaintiff until February 28, 2019 to earn her doctoral degree. Id. ¶ 25.

Plaintiff's "first-year performance report," which the College issued Plaintiff in October 2018, "commended her performance and stated that she had made 'progress toward tenure/promotion' despite the fact that she had yet to obtain her doctoral degree." Id. ¶ 52.

On December 11, 2018, Plaintiff presented her dissertation defense at Carnegie Mellon, planning to graduate that month. Id. ¶ 26. The dissertation committee (the "Committee") ultimately voted not to grant Plaintiff her PhD. Id. ¶ 27. The Committee cited "the experimental results of her studies" as the basis for its denial. See id. On January 4, 2019, Plaintiff "successfully appealed the decision" by the Committee. Id. ¶ 28. "One of the primary bases" of Plaintiff's appeal was that the Committee's decision "improperly factored in Plaintiff's disability and associated accommodations," in violation of the ADA and the Rehabilitation Act. Id. ¶ 29. This appeal was resolved, with the outcome that Carnegie Mellon "committed to working with Plaintiff on a 'positive path forward' to earn her doctoral degree by May 20, 2020." See id. ¶ 28.

On March 7, 2019, Plaintiff informed the College, "via email addressed to James Joseph," of the foregoing events. Id. ¶ 30. On March 29, Joseph "informed Plaintiff that [the College] was terminating Plaintiff's tenure-track contract because she still had not earned her doctoral degree." Id. ¶ 31. On the same day, Joseph offered Plaintiff a visiting position for the Fall 2019 semester. Id. ¶ 56.

On April 9, 2019, Plaintiff "met with Karin Botto, the College's Assistant Vice President of Human Resources, and requested, as a reasonable accommodation, an extension of time to obtain her doctoral degree so that she could remain in her tenure-track position." Id. ¶ 34. Botto

"responded by stating that [the College] had already accommodated her and questioned whether granting an additional accommodation was reasonable." Id. ¶ 35.

On May 15, 2019, Plaintiff "escalated her request" and met with Joseph Marina, the College's Provost, to discuss Plaintiff's accommodation request. Id. ¶ 36. Marina "stated that [the College] had already accommodated her, including by hiring her as an ABD." Id. ¶ 37. Plaintiff "disputed this characterization," noting that the job posting "allowed for the hiring of an individual as an ABD," and that the College "was not aware of Plaintiff's disability at the time of the job posting and the job positing was in no way specifically tailored to Plaintiff or her disability." Id. ¶ 38. On May 24, 2019, Marina e-mailed Plaintiff, stating that he had reviewed the job posting, and that "while the description affirmed that ABD applicants were welcome to apply, the posting still required completion of the doctorate within twelve months of appointment." Id. ¶ 39. Because Plaintiff had not met that requirement, Marina reasoned, the College would not continue Plaintiff's employment for the following academic year. Id. ¶ 40.

"As a result of [the College's] denial of Plaintiff's April 2019 reasonable accommodation request for an extension of time [to] obtain her doctoral degree, her contract was terminated, and Plaintiff was rendered unemployed." Id. ¶ 43.

Although Joseph had offered Plaintiff a Fall 2019 visiting professor position in their March 29, 2019 conversation, the College "did not follow through on that offer, despite the fact that the College had a clear need for Plaintiff's services . . . given that Defendant ultimately covered those courses only by overloading the schedules of Plaintiff's colleagues." Id. ¶ 56.

Plaintiff asserts both discrimination and retaliation claims, under the ADA, the Rehabilitation Act, and the NYHRL. Plaintiff alleges that Defendant discriminated against her on the basis of her disability, ADHD, by denying her 2019 accommodation request without

engaging in an interactive process and consequently terminating her employment. See id. ¶¶ 43–
44, 58. Plaintiff further alleges that in rescinding Joseph's offer to permit her to serve in a
visiting position in Fall 2019, the College retaliated against her for requesting a reasonable
accommodation. Id. ¶ 56. Plaintiff seeks damages and injunctive relief. See Compl. at 17–18.

### B.  Defendant's Motion

Defendant moves to dismiss the Complaint in its entirety. See Def.'s Mem. of Law at 6.
Defendant argues for dismissal of Plaintiff's discrimination claims on the following bases: (1)
Plaintiff was not "otherwise qualified" for the position of Assistant Professor; (2) Plaintiff
impermissibly seeks to hold Defendant accountable for disability discrimination committed by
Carnegie Mellon; (3) Plaintiff's 2019 accommodation request was not sufficiently related to her
alleged disability to form the basis of a cognizable failure-to-accommodate claim; and (4)
Defendant did not fail to provide a reasonable accommodation. See Def.'s Mem. of Law at 8–19.

Defendant moves to dismiss Plaintiff's retaliation claims on the following bases: (1) the
2019 accommodation request was not protected activity; and (2) Defendant's revocation of the
offer for a Fall 2019 visiting position was not an adverse action. See id. at 19–22.

To support its arguments, Defendant attempts to introduce five items of documentary
evidence: (1) Carnegie Mellon's March 20, 2018 letter granting Plaintiff an extension of time to
submit her dissertation, Mot., Ex. A; (2) the College's March 28, 2018 contract renewal letter,
Mot., Ex. B; (3) Plaintiff's March 7, 2019 e-mail to Joseph with its attachments, Mot. Ex. C;
(4) documentation from Carnegie Mellon that Plaintiff provided to the College regarding her
dissertation completion requirements subsequent to her appeal of the Committee's decision, Mot,
Ex. D.; and (5) a letter from the Acting Head of the Committee in response to Plaintiff's appeal
of the Committee's decision, Mot., Ex. E.

5

### III.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See id. at 678–79.

### IV.   DISCUSSION

#### A.  Defendant's Documentary Evidence

Because Defendant relies on documentary evidence at various points in its argument for dismissal, the Court must initially determine whether it may properly consider these documents.

With some narrow exceptions, the motion-to-dismiss stage is not an appropriate time for a defendant to submit evidence in an effort to contradict a plaintiff's allegations. A Rule 12(b)(6)

motion concerns only the "legal feasibility" of a complaint, see Global Network Communs., Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006), and "challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence," Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016). "The test of a claim's substantive merits is reserved for the summary judgment procedure, governed by Federal Rule of Civil Procedure 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule." Global Network Communs., Inc., 458 F.3d at 155 (internal quotation marks and alterations omitted).

Accordingly, courts adjudicating 12(b)(6) motions generally do not look beyond "facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and  . . . matters of which judicial notice may be taken." Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016) (quoting Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991)). "To be incorporated by reference, the complaint must make 'a clear, definite and substantial reference to the documents.'" Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria, 265 F.R.D. 106, 123 (S.D.N.Y. 2010) (quoting Helprin v. Harcourt Inc., 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003)). As an extension of the principle that a court may consider documents "incorporated in the complaint by reference," a defendant is permitted to introduce a document that the plaintiff has not expressly incorporated by reference but that is nevertheless "integral" to the complaint. See Goel, 820 F.3d at 559. A document is integral to the complaint, for this purpose, "where the complaint relies heavily upon its terms and effect." Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted). "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon

which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to complaint." Global Network Communs., 458 F.3d at 157.

Under either of these two standards, a plaintiff's mere mention, limited quotation, or limited paraphrase of a document is not sufficient. See Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989) ("The amended complaint merely discussed these documents and presented short quotations from them. Limited quotation does not constitute incorporation by reference.") (internal quotation marks omitted); Goel, 820 F.3d at 559 (noting with respect to the "integral" standard for documents not expressly incorporated by reference, that "[m]erely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotations' from the document is not enough") (quoting Global Network Communs., 458 F.3d at 156) (alterations omitted).

Additionally, "[e]ven where a document is considered 'integral' to the complaint . . .[i]t must . . . 'be clear that there exist no material disputed issues of fact regarding the relevance of the document.'" Nicosia v. Amazon.com, Inc., 834 F.3d 220, 231 (2d Cir. 2016) (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)). "This principle is driven by a concern that a plaintiff may lack notice that the material will be considered to resolve factual matters." Id. (citing Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)).

To justify submitting documentary evidence, Defendant argues, simply, that "[t]hese documents are properly before the Court for its consideration as they are all referred to and/or relied upon by Plaintiff." See Def.'s Mem. of Law at 2 n.2. But a comparison of the language in the Complaint and the content of these documents reveals that Plaintiff has done nothing more than "merely mention[]" their existence and briefly allude to their contents. Goel, 820 F.3d at

559. The only document Plaintiff even quotes is Exhibit C, the March 7, 2019 e-mail to Joseph,

in which Plaintiff references a statement by Carnegie Mellon's Director of PhD Services that

Carnegie Mellon is committed to a "positive path forward" with respect to Plaintiff's extended

deadline to complete her degree. See Mot., Ex. C; Compl. ¶ 28. This appears to be a "limited

quotation," Global Network Communs., 458 F.3d at 156, of a six-page multi-document exhibit

with varied additional content, including Plaintiff's account of her dissertation defense and the

Committee decision, and filings Plaintiff submitted on appeal. Even the body of the e-mail itself

is hundreds of words long, with a detailed discussion of various aspects of the appeal process at

Carnegie Mellon. The Court will not give Defendant free reign to scour this document for useful

evidence, simply based on Plaintiff's acknowledgment that she sent an e-mail to Joseph on

March 7, 2019 and her quotation of one three-word phrase from within.

Moreover, even if this document were "integral" to the Complaint, the Court could not

find that it is "clear that there exist no material disputed issues of fact regarding the relevance of

the document." Nicosia, 834 F.3d at 231. Defendant draws the Court's attention to a line in the e-

mail in which Plaintiff states, in reference to her appeal of the Committee decision, that "[t]he

key issue in dispute arises from the mixed results of my experiments, which did not consistently

support my theory." See Mot., Ex. C; Def.'s Mem. of Law at 16. As discussed more fully below,

Defendant suggests that Plaintiff's choice of words in this e-mail to Joseph undermines her claim

that the Committee denied her a degree for reasons related to her disability. But Plaintiff alleges

that the Committee's purported basis for denying her dissertation, namely the nature of her

research results, was pretextual. See Compl. ¶¶ 27–29. By a plausible reading, this e-mail is

consistent with that allegation, and not relevant to the issue of the Committee's discriminatory

intent: the e-mail is arguably an account of the Committee's stated justification for rejecting

Plaintiff's dissertation.[1] And while Plaintiff does not mention disability discrimination as an issue on appeal in this e-mail, which Defendant seems to imply is suspect, she also does not represent that the academic quality of her dissertation was the only subject matter of the appeal. And she does not specify the basis on which she prevailed.

In short, at most, this e-mail casts doubt on Plaintiff's allegations, or on her credibility; her discrimination claims do not "stand[] or fall" on the language of this e-mail. See Global Network Communs., 458 F.3d at 157. At this stage, at which the Court addresses legal sufficiency rather than substantive merits, before Plaintiff has had the opportunity for discovery, it would be improper for the Court to resolve a dispute over the relevance, let alone the weight, of the March 7, 2019 e-mail. These disputes are better suited to summary judgment, or trial.

With respect to the other Exhibits, even if Defendant had provided the Court with a basis to consider them, the Court would decline to draw any conclusions regarding their implications for 12(b)(6) dismissal. Defendant does not cite these other Exhibits in its substantive argument or explain their relevance. See generally Def.'s Mem. of Law. Defendant has the burden of persuasion in demonstrating that Plaintiff has failed to state a claim. See 2 Moore's Federal Practice - Civil § 12.34 (2020); Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991). Moreover, "ruling on a motion to dismiss by relying on unbriefed arguments is analogous to a *sua sponte* dismissal for failure to state a claim," Marchiano v. Berlamino, No. 10-CV-7819, 2012 WL 4215767, at *7 (S.D.N.Y. Sept. 20, 2012), which is generally disfavored, except when a claim is unarguably frivolous. See Bertuglia v. City of New York, 839 F. Supp. 2d 703, 722 n.3 (S.D.N.Y. 2012) (holding it "inappropriate" to dismiss a claim on the basis of an

---

[1] In the same e-mail, Plaintiff appears to contend that the Committee invented certain academic standards in rejecting her dissertation. See, e.g., Mot., Ex. C. (mentioning an agreement she entered into with Carnegie Mellon when she submitted her dissertation proposal, which "contained no provision that would justify failing me on the basis of mixed/null results").

argument defendants did not make); <u>Chevron Corp. v. Donziger</u>, 871 F. Supp. 2d 229, 254 (S.D.N.Y. 2012) (holding that when defendants failed to argue an "open question" on a motion to dismiss, "there is no basis" for dismissing the claim); <u>cf.</u> <u>Tyler v. Carter</u>, 151 F.R.D. 537, 540 (S.D.N.Y. 1993) ("A plaintiff asserting fantastic or delusional claims should not, by payment of a filing fee, obtain a license to consume limited judicial resources and put defendants to effort and expense. The policies arguing against *sua sponte* Rule 12(b)(6) dismissals do not apply in these circumstances."), <u>aff'd,</u> 41 F.3d 1500 (2d Cir. 1994); <u>MPM Silicones, LLC v. Union Carbide Corp.</u>, 931 F. Supp. 2d 387, 396 (N.D.N.Y. 2013) ("The Court has the authority under Rule 12(b)(6) to dismiss a complaint *sua sponte* for failure to state a claim upon which relief may be granted if the complaint lacks an arguable basis either in law or fact.") (internal quotation marks omitted). Without any guidance from Defendant, the Court declines to speculate as to whether or how these other Exhibits undermine the sufficiency of Plaintiff's claims.

Accordingly, the Court will disregard Defendant's documentary evidence, Mot., Exs. A–E, for purposes of this Memorandum-Decision and Order.

**B. Discrimination Claims**

The Court now turns to the legal sufficiency of Plaintiff's discrimination claims under the ADA, the Rehabilitation Act, and the NYSHRL. For the reasons that follow, Defendant's Motion is denied with respect to Plaintiff's discrimination claims.

*1. Standards*

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a). "To establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability, under either the ADA or the Rehabilitation Act, a plaintiff

must demonstrate that the plaintiff is a person with a disability under the meaning of the

statute in question; (2) an employer covered by the statute had notice of his disability; (3) with

reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and

(4) the employer has refused to make such accommodations." Natofsky v. City of New York,

921 F.3d 337, 352 (2d Cir. 2019) (internal quotation marks and alterations omitted). If a plaintiff

alleges that the failure to accommodate led to an adverse employment action, "a plaintiff must

show the connections between (1) the failure to accommodate a disability, (2) the performance

deficiencies, and (3) the adverse employment action." Id.[2]

Generally, NYHRL claims for discrimination on the basis of disability "are governed by

the same legal standards as federal ADA claims." Rodal v. Anesthesia Grp. of Onondaga, 369

F.3d 113, 117 n.1 (2d Cir. 2004).

2. *Analysis*

a. Whether Plaintiff Was "Otherwise Qualified"

Defendant argues that it was not required to provide Plaintiff with a reasonable

accommodation, because Plaintiff was not "qualified" for the Assistant Professor position. See

Def.'s Mem. of Law at 10–13; 42 U.S.C. § 12112(a) (prohibiting employers from

"discriminat[ing] against a *qualified* individual on the basis of disability in regard to . . . the

hiring, advancement, or discharge of employees.") (emphasis added); 9 NYCRR § 466.11 ("To

---

[2] Plaintiff appears to assert an adverse-action discrimination claim that incorporates an alleged denial of a reasonable accommodation, as opposed to a standalone failure-to-accommodate claim. See Compl. ¶ 43. Precisely, she alleges that the College's "failure to accommodate resulted in an adverse employment action," namely, her termination. Berger v. New York City Police Dep't, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018); see also Parker v. Columbia Pictures Indus., 204 F.3d 326, 338 (2d Cir. 2000) ("Terminating a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA.").

be entitled to the protection of the Human Rights Law, the disabled individual must have the requisite job qualifications as well as be able to satisfactorily perform in the job.").

The ADA defines the term "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The term "essential functions," while not defined in the statute's text, is generally defined in Equal Employment Opportunity Commission ("EEOC") regulations to mean the "fundamental job duties" to be performed in the position in question, as opposed to its "marginal functions." See 29 C.F.R. § 1630.2(n)(1).

In evaluating whether a particular job function is "essential," courts consider, non-exhaustively, "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." McMillan v. City of New York, 711 F.3d 120, 126 (2d Cir. 2013). "In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." Shannon v. New York City Transit Authority, 332 F.3d 95, 100 (2d Cir. 2003) (internal quotation marks and alterations omitted). Nevertheless, courts must conduct "a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice." McMillan, 711 F.3d at 126. "Usually[,] no one listed factor will be dispositive." Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997).[3]

---

[3] EEOC guidance elaborates on the potential tension between an employer's description of a position's essential functions and the reality of what a job entails:

Defendant argues that Plaintiff was not qualified at the time of her termination, because she did not have a PhD. Defendant proposes the following principle: "Where a provisional employee is employed on the condition that they meet a further qualification in the future, or where an employee is required to undergo testing in order to determine if he or she continues to meet a particular qualification, the employee is not qualified if they fail to obtain or maintain the minimum qualifications of the position." Def.'s Mem. of Law at 10.

Defendant cites several cases in attempting to establish this general principle. They are distinguishable from this one, and the exercise of distinguishing them underscores the impropriety of dismissal in this case prior to the type of fact-intensive inquiry that would be enabled by discovery.

In Dancause v. Mount Morris Cent. Sch. Dist., No. 13-CV-6019, 2013 U.S. Dist. LEXIS 83893 (W.D.N.Y. June 14, 2013), an English teacher brought an ADA claim against an employer-school district, alleging that the defendant terminated her on the basis of her disability after she requested time off to address a medical issue. See id. at *1–2. The Court held that she was not "qualified" for the position, because she lacked a professional certification to teach English as a second language, which was legally required for her position. See id. at *7–8. The Court held as much notwithstanding her allegation that she and her employer had been "working

---

> The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential. For example, an employer may state that typing is an essential function of a position. If, in fact, the employer has never required any employee in that particular position to type, this will be evidence that typing is not actually an essential function of the position.

Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n).

together in good faith on a mutually acceptable plan to ensure Plaintiff's proper Certification."

See id. at *1–2.

Dancause is distinguishable, because, by Plaintiff's allegations, a doctoral degree was not

a prerequisite for the Assistant Professor position by the College's standards, let alone a legal

requirement. In Dancause, the defendant had already violated state law by hiring the plaintiff, a

straightforward bar to her qualification that made the legal insufficiency of Plaintiff's claim clear

without further factual development.[4] Dancause is consistent with a line of cases in which courts

have held that failure to acquire a state-mandated teaching certification renders a plaintiff

unqualified for purposes of an employment discrimination claim—a sensible principle, given that

an educational institution legally has no discretion in the matter. See Carmellino v. Dist. 20 of

New York City Dep't of Educ., No. 03-CV-5942, 2006 WL 2583019, at *33 (S.D.N.Y. Sept. 6,

2006) (collecting cases).[5] But in the present case, the Court confronts the more nuanced inquiry

of precisely when a teacher whose lack of a degree did not render her unqualified for at least the

first year of her employment, by her employer's standards, ceased being able to perform the

essential functions of the position. This inquiry is complicated by the possible flexibility of her

employer's expectations. According to the job posting, Plaintiff was required merely to

"reasonably expect" that she would obtain a degree within twelve months. Compl. ¶ 20.

Moreover, she did not commit to doing so by contract. See id. ¶ 41.

---

[4]   Kinneary v. City of New York, 601 F.3d 151 (2d Cir. 2010), another case Defendant cites in passing, see Def.'s Mem. of Law at 11, is distinguishable for an analogous reason. In Kinneary, a plaintiff boat captain was terminated for failing to retain a captain's license, which was a legal prerequisite to continued employment. See id. at 156.

[5]   Aff'd in part sub nom. Mauskopf v. Dist. 20 of New York City Dep't of Ed., 299 F. App'x 100 (2d Cir. 2008), and aff'd in part sub nom. Papasmiris v. Dist. 20 of New York City Dep't of Ed., 299 F. App'x 97 (2d Cir. 2008).

In <u>Hernandez-Cruz v. Fordham Univ.</u>, 521 F. Supp. 1059 (S.D.N.Y. 1981), the plaintiff alleged that he had been denied tenure based on his Puerto Rican heritage. <u>See id.</u> at 1059. The plaintiff was a candidate for tenure, but he had worked as a teacher up to that point without having a terminal degree, a requirement for tenure. <u>See id.</u> at 1070–71. The Court held that he was not qualified and thus failed to establish a prima facie case of race discrimination. <u>See id.</u> This case is disanalogous, because, as in <u>Dancause</u>, the plaintiff in <u>Hernandez-Cruz</u> was denied a position for which a degree was a threshold requirement, as opposed to being terminated due to a failure to satisfy an expectation upon hiring that he ultimately obtain a degree. <u>See id.</u>

More fundamentally, <u>Hernandez-Cruz</u> lacks persuasive force due to its procedural posture. The Court rendered its opinion after a bench trial. <u>See id.</u> at 159. The court's conclusion that the plaintiff's failure to obtain a terminal degree rendered him unqualified was based on evidence regarding the qualifications of other teachers granted tenure at the university and evidence establishing the opinions of the plaintiff's colleagues about the importance of the terminal degree requirement. <u>See id.</u> at 1070–71, 1071 n.4. If anything, <u>Hernandez-Cruz</u> counsels against dismissal before these sorts of details of the realities of Plaintiff's workplace are known. Perhaps discovery will reveal that the twelve-month degree requirement for professors hired ABD was strictly enforced at the College and was rooted in widely shared professional values, or perhaps not. <u>See</u> <u>McMillan</u>, 711 F.3d at 126 (noting that a court should consider "the work experience of past employees in the position, and the work experience of current employees in similar positions"). But Plaintiff's allegations do not address these issues.

Defendant strays further from a necessary focus on 12(b)(6) pleading requirements by citing <u>Williams v. MTA Bus Co.</u>, No. 17-CV-7687, 2020 U.S. Dist. LEXIS 69558 (S.D.N.Y. Apr. 20, 2020), a summary judgment case involving a hearing-impaired plaintiff denied a job as

a stock worker after he failed to pass a qualifying multiple-choice test, see id. at *3–4. The court's conclusion that the plaintiff was not "qualified" under the Rehabilitation Act was based on an examination of the government employer's detailed regulations regarding the educational and work experience requirements for the job. See id. at *23–26; see also See McMillan, 711 F.3d at 126 (noting that a court should consider the "employer's judgment" regarding a position's essential functions).

Williams, again, involves a threshold requirement for initial hire as opposed to an employer's expectation that an employee will ultimately acquire a professional certification. But more importantly, the court's summary judgment opinion in Williams was based on copious evidence shedding light on the employer's precise expectations of applicants, see Williams, 2020 U.S. Dist. LEXIS 69558, at *23–24, something lacking at this stage of the present case.

Although the Court will ultimately have to review the evidence to resolve the fact-dependent issues discussed, Plaintiff's allegations at this stage are adequate to establish that she was qualified at the time of her termination. According to Plaintiff, nothing aside from the College's stated rationale upon Plaintiff's termination indicates that the College viewed the twelve-month rule as a hard requirement. The initial job posting allegedly specified that applicants must "reasonably expect[]" to complete their doctoral degree within twelve months of hiring, which Plaintiff allegedly did, at the time she was hired. See id. ¶¶ 14, 20–21. At this stage, the Court grants Plaintiff the favorable inference that a requirement that she "reasonably expect" to acquire a degree within twelve months is not equivalent to an inflexible requirement that she actually do so. Moreover, that Defendant assumed at the time of hiring that her lack of a degree would pose no obstacle to the effective execution of her job duties for at least year seems to undercut Defendant's contention in this litigation that she could not perform essential job

functions without a PhD. Plaintiff alleges that at the time of her termination, she sought to continue working in the same position, with the same responsibilities and the same title, for several additional months before she acquired her degree, see id. ¶ 34; she did not seek to graduate to a new post with greater associated responsibilities or privileges. Cf. Hernandez-Cruz, 521 F. Supp. at 1070 ("[T]he qualifications that a plaintiff must demonstrate when complaining of discrimination in the denial of tenure are not merely those necessary for continued reappointment as a nontenured faculty member. Instead, the grant of tenure involves a virtual life-long commitment and therefore stricter standards for selecting among candidates."). Furthermore, importantly, Plaintiff alleges that her employment contract did not mention any deadline to acquire a degree. See Compl. ¶ 41.

Certain allegations regarding "how the job is actually performed in practice," McMillan, 711 F.3d at 126, provide additional support for an inference that Plaintiff was qualified despite her delayed acquisition of a degree. Plaintiff alleges that the College granted her an initial extension beyond the twelve-month period, and that during this extension period, she received a positive work evaluation that downplayed the significance of her delay in acquiring a degree. See id. ¶ 52. Both facts, if true, suggest that her failure to acquire a degree within twelve months was not a significant inconvenience for the College and did not pose an immediate obstacle to her continued satisfactory performance of her job duties. See Eichmuller v. Sarasota Cty. Gov't, No. 20-CV-47, 2021 U.S. Dist. LEXIS 3220, at *11–13 (M.D. Fla. Jan. 8, 2021) (denying summary judgment based on evidence that a six-month deadline to obtain a driving license had been extended for plaintiff and other employees).[6]

---

[6] Generally, in discriminatory discharge cases, courts require only a minimal showing from the Plaintiff with respect to the qualification prong of a *prima facie* case, based on an inference that an employer's choice to hire a plaintiff and retain her for a significant period indicates that she is qualified. See, e.g. Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) ("In a

Accordingly, Plaintiff has sufficiently alleged that she was qualified for the position of Associate Professor at the time of her termination.

> b.  Whether Plaintiff Was Terminated "On the Basis of" Her Disability

The ADA prohibits employers from "discriminat[ing] against a qualified individual *on the basis of* disability in regard to . . . the hiring, advancement, or discharge of employees." 42 U.S.C. § 12112(a) (emphasis added). The phrase "on the basis of" establishes a causation requirement for employment discrimination claims. See Natofsky, 921 F.3d at 345.

Defendant argues that Plaintiff impermissibly seeks to hold the College accountable for disability discrimination committed by Carnegie Mellon, and that Plaintiff's 2019 accommodation request was not sufficiently related to her alleged disability to form the basis of a cognizable failure-to-accommodate claim. While the parties have not framed these issues as matters of causation, they are best understood in this way. More precisely, the issue of the College's indirect liability for alleged discrimination by Carnegie Mellon concerns proximate

discharge case in which the employer has already hired the employee into the job in question, the inference of minimal qualification is, of course, easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that she is minimally qualified."); Warren v. Time Warner Cable, Inc., No. 17-CV-4029, 2020 U.S. Dist. LEXIS 185348, at *30 (E.D.N.Y. Sep. 28, 2020) ("Here, Warren was hired by Time Warner in 2014 and remained in its employ until July 1, 2016. Regardless of any issues with her performance, a reasonable jury could find that Warren has sufficiently demonstrated that she was qualified for the position."). Satisfactory job performance also supports an inference of qualification. See, e.g., Alejandro v. New York City Dep't of Educ., No. 15-CV-3346, 2017 U.S. Dist. LEXIS 49555, at *41–42 (S.D.N.Y. Mar. 31, 2017) ("Alejandro, who had undisputedly worked as a parent coordinator at M.S. 80 for several years . . . has proffered a performance evaluation from the school year immediately preceding the one at issue that rates her performance 'satisfactory' and describes her having been an 'excellent employee' over the previous four years who 'exceeded all . . . expectations.' Alejandro's burden of establishing her qualification for the position at this stage is minimal, and this evidence is sufficient to meet it.").

These principles do not apply with the same force in this case, in which Plaintiff alleges she was hired with the expectation that she would eventually acquire a degree, and in which Defendant argues Plaintiff became unqualified only once she failed to obtain a degree by a certain deadline. But the same inferences have *some* force here, in the absence of a clear indication that the twelve-month requirement was categorically articulated or strictly applied.

causation—that is, whether the chain of causation between Plaintiff's disability-related accommodation requests at Carnegie Mellon and her ultimate termination by the College is too attenuated, due to the interceding acts of Carnegie Mellon. Whether Plaintiff's 2019 extension request at the College was necessitated by her disability is a question of but-for causation; in other words, if she had not experienced ADHD-related limitations at Carnegie Mellon, would she still have needed to request an extension from the College and thus still been terminated?

In her Complaint, Plaintiff alleges, somewhat confusingly, that "[i]n failing to offer Plaintiff another extension of time to obtain her doctoral degree, [the College] perpetuated Carnegie Mellon's initial disability discrimination against Plaintiff," Compl. ¶ 33, namely the Committee's decision to deny her a PhD for reasons that "improperly factored in Plaintiff's disability and associated accommodations," id. ¶ 29. In response, Defendant insists that the ADA "does not require employers to accommodate the effects of a third-party's discrimination," and argues that a contrary principle would have absurd results. See Def.'s Mem. of Law at 17–18 (noting that "[a] job applicant who failed out of an engineering program could claim that his university discriminated against him and therefore that an engineering firm is required to hire him lest it become a facilitator of the school's alleged discrimination," and that "a law school graduate working for a law firm who fails the bar exam could allege that she was not adequately accommodated by the Board of Law Examiners and therefore the law firm is not permitted to discharge her for failing to obtain a law license").

Plaintiff has framed the issue in an unhelpful way; and Defendant is correct that employers are essentially responsible only for their own discriminatory employment decisions. But elsewhere in her Complaint, Plaintiff makes clear that she seeks to hold the College liable for _its own_ allegedly discriminatory decision to terminate her employment. See Compl. ¶ 43 ("As

a result of [the College's] denial of Plaintiff's April 2019 reasonable accommodation request for an extension of time [to] obtain her doctoral degree, her contract was terminated, and Plaintiff was rendered unemployed."). Even though there are multiple causal steps between the initial expression of her ADHD at Carnegie Mellon and the College's ultimate denial of her extension request, Plaintiff undoubtedly alleges a causal relationship between the former and the latter.

There is a "but-for" causal relationship in this case, although likely not a proximate causal relationship. The Second Circuit has held that the "on the basis of" language in the ADA entails a but-for causation standard for employment discrimination claims. See Natofsky, 921 F.3d at 349.[7] That is, a defendant is liable if, "'but for' the disability, the adverse action would not have been taken." See id. at 347. According to Plaintiff's allegations, but for Plaintiff's ADHD and associated accommodation requests, the Committee would not have denied her a PhD, causing a delay that necessitated the extension request from the College that led to Plaintiff's termination.

In Natofsky, the Second Circuit established a but-for causation standard in the context of a dispute over the proper test of discriminatory intent—i.e. "mixed-motive," "sole causation," or "but-for"—and not in the context of a choice between but-for and proximate causation. See id. at 346–50. Thus, Natofsky is silent as to whether a plaintiff must additionally demonstrate proximate causation. While case law addressing this precise issue is scarce, there is at least one appellate case explicitly rejecting a proximate causation requirement under analogous circumstances, in the context of a Rehabilitation Act claim involving discrimination in a government program. See Shaikh v. Tex. A&M Univ. College of Med., 739 Fed. App'x. 215

---

[7]  The court held the same with respect to Rehabilitation Act employment discrimination claims. See id. at 344–46. Since NYHRL standards generally parallel federal standards for disability discrimination claims, the Court reaches the same conclusion with respect to Plaintiff's NYHRL discrimination claim. See Rodal, 369 F.3d at 117 n.1.

(5th Cir. 2018). In <u>Shaikh</u>, the Plaintiff alleged that his medical school discriminated against him by dismissing him from the medical program based on his failure to timely pass the United States Medical Examination for reasons related to his disability. <u>See id.</u> at 215. The dissent argued that the "solely by reason of" standard of discriminatory intent (which is stricter than the Second Circuit's "but-for" standard) required a "direct causal nexus" between the plaintiff's disability and his dismissal from the school, and that the plaintiff had not satisfied such a requirement. <u>See id.</u> at 226. The court rejected the dissent's proposed "direct causal nexus" requirement, permitting the plaintiff's claim to survive 12(b)(6) dismissal. <u>See id.</u> at 223 ("He plausibly alleges that his disability was the only cause of his failure to retake the USMLE Step 1 by the end of his leave of absence and that this failure triggered the College's decision to constructively dismiss him from the program.").

Before <u>Natofsky</u>, the Second Circuit embraced the general principle that the causal relationship between an adverse employment action and a disability "need not be direct," also in the context of a then-prevailing "solely by reason of" standard of discriminatory intent. <u>See Sedor v. Frank</u>, 42 F.3d 741, 746 (2d Cir. 1994) ("The causal relationship between disability and decision need not be direct, in that causation may be established if the disability caused conduct that, in turn, motivated the employer to discharge the employee."). In at least one case, this principle was applied to bar termination due in part to the interceding actions of a third party in response to conduct attributable to a plaintiff's disability. <u>Szuszkiewicz v. JPMorgan Chase Bank</u>, 12 F. Supp. 3d 330, 342 (E.D.N.Y. 2014) (denying a motion to dismiss based on plaintiff's allegations that his employer discharged him after finding out that he had been held civilly liable several years before for conduct attributable to mental illness). Given that <u>Natofsky</u> has since

established a more forgiving test of discriminatory intent, it is logical to assume that "direct" causation is still not required.

Accordingly, there is no proximate causation requirement for disability discrimination claims brought under the ADA or the Rehabilitation Act.[8] Defendant is mistaken in contending that the College is not liable for denying a reasonable accommodation merely because the accommodation was necessitated partly by a third party's acts.

Separately, the College argues that Plaintiff has failed to establish but-for causation. See Def.'s Mem. of Law at 15–17; Reply at 5. The College argues that Plaintiff's delay in obtaining her doctoral degree from Carnegie Mellon was not due to her disability, but rather to the substandard academic quality of her dissertation. See id. at 16. But Defendant's argument relies on the contents of Plaintiff's March 7, 2019 e-mail to Joseph, in which Plaintiff, by Defendant's interpretation, acknowledged that the Committee denied her a PhD due to defects in her research results. See Mot., Ex. C. The Court will not decide whether Defendant's interpretation of this e-mail is correct, because the Court is not permitted to consider this evidence at this procedural stage. See supra Part IV(A). In her Complaint, Plaintiff alleges that the Committee's stated justification for denying her a PhD was pretextual, and that the Committee in fact rejected her dissertation primarily because she had ADHD and had requested extra time accommodations. See Compl. ¶¶ 28–29.

Plaintiff's sufficiently alleges that but for her disability, the Committee would have accepted her dissertation, obviating the need for the 2019 extension request from the College that led to her termination. In other words, the College terminated her "on the basis of" her disability.

---

[8] Since NYHRL standards generally parallel federal standards for disability discrimination claims, the Court reaches the same conclusion with respect to Plaintiff's NYHRL discrimination claim. See Rodal, 369 F.3d at 117 n.1.

d.   Whether Plaintiff's Requested Accommodation Was Reasonable

Defendant disputes the reasonableness of the accommodation Plaintiff requested in 2019, namely a second extension of the College's deadline to complete her doctoral degree. See Def.'s Mem. of Law at 13–15, 18–19. Defendant cites Kinneary v. City of New York, 601 F.3d 151 (2d Cir. 2010), in which the Second Circuit held that a defendant-employer was not required to give an employee with shy-bladder syndrome a second chance to take a qualifying urinalysis drug test after having already provided legally sufficient accommodations to enable him to take the first drug test, see id. at 155–56. Likewise, Defendant argues, the College had already provided Plaintiff with a reasonable accommodation, in the form of a six-month extension until February 2019 to complete her dissertation, and any further extension exceeded the bounds of reasonableness. See Def.'s Mem. of Law at 15.

To clarify a misunderstanding evident in Defendant's brief, the Court notes that Plaintiff does not specify any particular length for this second requested extension. Defendant maintains that Plaintiff requested an additional extension of ten months, for a combined total of sixteen months, considering her earlier extension request. See id. at 19.[9]

To the contrary, Plaintiff does not appear to allege that she requested an extension until May 20, 2020, the maximum date proposed by Carnegie Mellon, or an extension of any specific length. Rather, she alleges that she attempted to engage the College in a conversation about a further extension, but that this conversation quickly reached a dead end when these officials insisted that *no* further extension was warranted. On March 7, 2019, Plaintiff e-mailed Joseph to

_____

[9]   The mathematical basis for Defendant's assertion is not clear. Plaintiff suggests that she informed Defendant that Carnegie Mellon had represented it was "committed to working with Plaintiff on a 'positive path forward' to earn her doctoral degree by May 20, 2020." See Compl. ¶ 28. If Plaintiff had requested an extension until May 20, 2020 to complete her degree, that would amount to roughly fourteen additional months, for a total of about twenty months.

inform him of the Committee denial and appeal outcome, but not to propose an extension of a particular length. See Compl. ¶ 30. Joseph responded by informing her that her contract would be terminated. Id. ¶ 31. Under circumstances that Plaintiff has not fully explained, Joseph also offered Plaintiff a Fall 2019 visiting professor position. See id. ¶ 56. On April 9, 2019, Plaintiff met with Botto, the Assistant Vice President of Human Resources, to request "an extension of time to obtain her doctoral degree so that she could remain in her tenure-track position," again not specifying any specific extension length. See id. ¶ 34. Botto "responded by stating that [the College] had already accommodated her and questioned whether granting an additional accommodation was reasonable." Id. ¶ 35. On May 15, 2019, Plaintiff met with Provost Marina and engaged in a conversation on the same general topic, in the course of which Marina "stated that [the College] had already accommodated [Plaintiff], including by hiring her as an ABD, " and that no further extension request would be entertained. See id. ¶¶ 36–37. In a May 24, 2019 e-mail, Marina conceded that hiring Plaintiff ABD did not constitute an accommodation, but that the job positing "required completion of the doctorate within twelve months of appointment," and Plaintiff's failure to do so warranted termination of her contract. See id. ¶ 39.

Plaintiff, in other words, alleges that the parties did not engage in an "interactive process" through which they might have negotiated a specific extension length. "[T]he ADA envisions an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." McBride v. BIC Consumer Products Mfg. Co., Inc., 583 F.3d 92, 99 (2d Cir. 2009) (internal quotation marks omitted); see also 29 C.F.R. § 1630.2(o)(2)(ii)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation."). Because the reasonableness of an

accommodation is determined by, *inter alia*, its availability and cost to the employer, see Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995), information in the employer's possession, this interactive process helps an employee identify a specific reasonable accommodation, see Cusack v. News Am. Marketing In-Store, Inc., 371 F. App'x 157, 157 (2d Cir. 2010).

In failing to engage in an interactive process, a defendant "risks not discovering a means by which an employee's disability could have been accommodated and thereby increases the chance that it will be found to have violated the ADA." McBride, 583 F.3d at 101. Under such circumstances, a plaintiff need not plead the nature of her requested accommodation with specificity, as she has not had the opportunity to discuss a specific accommodation with her employer. See Price v. Berkshire Farm Ctr. & Servs. For Youth, No. 12-CV-1797, 2013 WL 6410124, at *2 (N.D.N.Y. Dec. 9, 2013) (Kahn, J.) ("Defendant's failure to engage in the ADA-required interactive process deprived Plaintiff of information regarding the reasonableness of potential accommodations and may thereby have caused the lack of specificity in Plaintiff's Complaint. Defendant is therefore not entitled to dismissal."); see also Goonan v. Fed. Reserve Bank of N.Y., 916 F. Supp. 2d 470, 484 (S.D.N.Y. 2013) (denying motion to dismiss where plaintiff "pleaded factual allegations sufficient to show that [her employer] failed to participate in good faith and to make reasonable efforts to help the other party determine what specific accommodations are necessary") (internal quotation marks omitted)). A party is responsible for the breakdown of an interactive process when she "obstructs or delays the interactive process" or "fails to communicate, by way of initiation or response." Goonan, 916, F. Supp. 2d at 480 (quoting Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130 (7th Cir.1996)).

Drawing all reasonable inferences in Plaintiff's favor, as the Court must, see Allaire Corp., 433 F.3d at 249–50, the Court finds that the breakdown of the interactive process was

attributable to the College's refusal to discuss possible reasonable accommodations. By Plaintiff's allegations, she initiated an open-ended conversation about extending her deadline to complete her degree, but College officials refused to entertain any accommodation that would permit Plaintiff to retain her position as Assistant Professor. See Pl.'s Mem. of Law at 15.

Perhaps the evidence will ultimately indicate that Joseph's offer of a non-tenure-track position was at least colorably reasonable, and thus that this offer established the College's good-faith participation in the interactive process. See McBride, 583 F.3d at 97 ("In the context of the ADA, reasonable accommodation may include, inter alia . . . 'reassignment to a vacant position.'") (quoting 42 U.S.C. § 12111(9)(B)); Ford v. Marion Cty. Sheriff's Office, 942 F.3d 839, 855 (7th Cir. 2019) ("A demotion can be a reasonable accommodation when the employer cannot accommodate the disabled employee in her current or prior jobs or an equivalent position."). Alternatively, re-appointment to a non-tenure track position might have amounted to an unnecessary and patently undesirable demotion, rendering Joseph's offer unserious and unproductive.[10] At this stage, the Court draws the latter inference, in Plaintiff's favor.

Because Plaintiff has plausibly alleged that the College failed to engage in the interactive process in good faith, Plaintiff is excused, until after discovery, from the requirement that she identify a specific accommodation that would have enabled her to acquire her degree without imposing an undue burden on the College. See McBride, 583 F.3d at 101 ("The employer's failure to engage in such an interactive process . . . does not relieve a plaintiff of her burden of demonstrating, following discovery, that some accommodation of her disability was possible.").

---

[10]  Arguably, reassignment to a non-tenure track position would have been an adverse employment action. See Kairam v. West Side GI, LLC, 793 Fed. Appx. 23, 27 (2d Cir. 2019) (noting that "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation" can constitute an adverse employment action).

Nevertheless, even if the College had engaged in an interactive process in good faith, Defendant would fail to establish that a further extension of even the maximum length contemplated was necessarily unreasonable. Generally, "whether an accommodation request is reasonable is more appropriately determined on summary judgment or by the factfinder at trial." Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 438 (E.D.N.Y. 2015). "At the motion to dismiss stage, the Defendant bears the weighty burden of showing that the fact-intensive inquiry prerequisite to a finding of reasonable accommodation falls completely in its favor." Goonan, 916 F. Supp. 2d at 482 (alteration omitted). Defendant attempts to meet this demanding burden by pointing to case law indicating that more than one year of medical leave is per se unreasonable. See Def.'s Mem. of Law at 19 (citing Micari v. TWA, 43 F. Supp. 2d 275, 281(E.D.N.Y. 1999) (noting that "[w]here medical leaves stretch beyond a year," they cannot be considered reasonable "as a matter of law")). But Plaintiff requested to continue working, not to cease working while retaining her position. There is no basis for an analogy.

Accordingly, Defendant's Motion is denied as to Plaintiff's discrimination claims.

### C.  Retaliation Claims

#### 1.  Standards

To establish a retaliation claim under the ADA, a plaintiff must show engagement in a protected activity, the employer's knowledge of the plaintiff's engagement in the protected activity, an adverse decision or course of action taken, and a causal connection between the protected activity and the adverse action. See Natofsky, 921 F.3d at 353. "The standard for an 'adverse employment action' in a retaliation claim . . . is not as demanding as it is in a discrimination claim. In the retaliation context, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well

might have dissuaded a reasonable worker from [engaging in protected activity].'" Quadir v. New York State DOL, 39 F. Supp. 3d 528, 542–543 (S.D.N.Y. 2014) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). NYHRL retaliation claims are governed by the same general standards. See Pearson v. Unification Theological Seminary, 785 F. Supp. 2d 141, 157 (S.D.N.Y. 2011).

      *2. Analysis*

      Plaintiff alleges that in rescinding Joseph's offer to permit her to serve in a visiting position in Fall 2019, the College retaliated against her for requesting a reasonable accommodation. See Compl. ¶ 56.

      Defendant argues, first, that Plaintiff did not participate in protected activity. See Def.'s Mem. of Law at 19–20. Defendant acknowledges that requesting a reasonable accommodation is protected activity. See id. at 20; see also Weixel v. Bd. of Educ. of City of N.Y., 287 F.3d 138, 149 (2d Cir. 2002) (noting that a request for a reasonable accommodation is protected activity under the ADA and the Rehabilitation act). Defendant argues, however, that Plaintiff's request was not protected, because the accommodation she requested was not reasonable. See Def.'s Mem. of Law at 20. But an accommodation request need not be legally reasonable to be protected, as long as the plaintiff made the request in "good faith." See, e.g., Jones v. City of New York, No. 17-CV-4894, 2020 WL 91532, at *7 (S.D.N.Y. Jan. 8, 2020); Norman v. NYU Langone Health Sys., No. 19-CV-67, 2020 U.S. Dist. LEXIS 180990, at *23 (S.D.N.Y. Sep. 30, 2020). And in any case, the College has failed to demonstrate that Plaintiff's requested accommodation was unreasonable. See *supra* Part IV(B)(2)(d). More fundamentally, Defendant argues that Plaintiff's extension request was not protected because it was not related to her disability; rather, it was a request for a gratuitous favor necessitated by her academic

shortcomings at Carnegie Mellon. See Def.'s Mem. of Law at 12; Reply at 9. This argument is predicated on Defendant's interpretation of Plaintiff's March 7, 2019 e-mail to Joseph regarding the Committee decision, Mot., Ex. C, documentary evidence the Court is not permitted to consider at this time. See *supra* Part IV(A).

Plaintiff's NYHRL retaliation claim, however, is dismissed, because requesting an accommodation is not protected activity under the NYHRL. See D'Amico v City of New York, 159 A.D.3d 558, 558 (N.Y. App. Div. 1st Dep't 2018); McKenzie v. Meridian Capital Group, LLC, 35 A.D.3d 676, 677 (N.Y. App. Div. 2d Dep't 2006); Serdans v. New York & Presbyt. Hosp., 112 A.D.3d 449, 450 (N.Y. App. Div. 3d Dep't 2013). State courts have reasoned that under the NYHRL, requesting an accommodation does not constitute protected activity, because the statute prohibits "discriminat[ion] against any person *because he or she has opposed any practices forbidden under this article*," N.Y. Exec. Law § 296(1)(e) (emphasis added), and requesting an accommodation does not amount to opposing an employer's illegal conduct. See, e.g. McKenzie, 35 A.D.3d at 677 ("The plaintiff alleged in her complaint that her employment was terminated in retaliation for requesting additional leave time to accommodate her disability. However, she did not allege that her request was made in opposition to a practice forbidden by the state or city Human Rights Laws"). Although the parties have not briefed this precise issue, they have addressed the question of whether requesting an accommodation is protected activity, with Plaintiff arguing that it is. See Pl.'s Mem. of Law at 17. Because Plaintiff has been heard on this issue, and because the legal insufficiency of this claim is clear, the Court dismisses Plaintiff's NYHRL retaliation claim. First Capital Asset Mgmt., Inc. v. Brickellbush, Inc., 219 F. Supp. 2d 576, 580 (S.D.N.Y. 2002) ("[A] district court may dismiss claims *sua sponte* for failure to state a claim, at least so long as the plaintiff had notice and an opportunity to be heard on the

issue."), aff'd sub nom. First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159 (2d Cir. 2004); MPM Silicones, 931 F. Supp. 2d at 396 ("The Court has the authority under Rule 12(b)(6) to dismiss a complaint *sua sponte* for failure to state a claim upon which relief may be granted if the complaint lacks an arguable basis either in law or fact.") (internal quotation marks omitted).

Second, the College argues that Plaintiff did not suffer an adverse employment action. See Def.'s Mem. of Law at 20–22. Defendant contends that offering Plaintiff a visiting professor position would have amounted to creating a "new job," an unreasonable accommodation as a matter of law, and that a decision to rescind a legally gratuitous accommodation necessarily does not constitute an adverse action. See Def.'s Mem. of Law at 21. Defendant's argument misses the mark, in two ways. First, there is no indication in Plaintiff's Complaint that the visiting professorship was a "new" position invented for Plaintiff's benefit and tailored to her needs; plausibly, the "visiting professor" role already existed, and the position Joseph offered was a vacant one. See McBride, 583 F.3d at 97 ("In the context of the ADA, reasonable accommodation may include, *inter alia* . . . 'reassignment to a vacant position.'") (quoting 42 U.S.C. § 12111(9)(B)); cf. Exarhakis v. Visiting Nurse Serv., No. 02-CV-5562, 2006 U.S. Dist. LEXIS 5360, at *23–24 (E.D.N.Y. Feb. 13, 2006) ("It is well-settled law that an employer need not create a new job to [accommodate] a disabled employee . . . The record is undisputed that the special projects position did not exist prior to her injury, that it was created exclusively with Exarhakis's experience, capabilities, and limitations in mind, and that had this position not been created, plaintiff could not have returned to work.").

More basically, an employment decision need not independently support a discrimination claim in order to constitute an adverse action for purposes of a retaliation claim. Cf. Lee v. Saul, No. 19-CV-6553, 2020 WL 7029264, at *6 (S.D.N.Y. Aug. 31, 2020) ("While a discrimination

claim must demonstrate adverse actions affecting the terms and conditions of employment, a retaliation claim may be based on employer actions that are likely to deter [protected activity].") (internal quotation marks omitted), report and recommendation adopted as modified, No. 19-CV-6553, 2020 WL 5836513 (S.D.N.Y. Sept. 30, 2020). Effectively, the College rescinded a job offer, leaving Plaintiff unemployed; and rescinding an offer of employment constitutes an adverse action. See, e.g. Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 179 (2d Cir. 2005) (holding that rescinding a job offer constituted an adverse action); Blakely v. Cessna Aircraft Co., 256 F. Supp. 3d 1169, 1174 (D. Kan. 2017) (holding that rescinding an offer to re-hire the plaintiff after he was laid off due to a regular reduction in force constituted an adverse action). Accordingly, Defendant's Motion is denied as to Plaintiff's federal retaliation claims.

## V.      CONCLUSION

Accordingly, it is hereby:

**ORDERED**, Defendant's Motion to Dismiss (Dkt. No. 8) is **GRANTED in part and DENIED in Part**; Plaintiff's retaliation claim under the NYHRL is dismissed, while Plaintiff's other claims may proceed; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 01, 2021
            Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge